# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

PAMELA GREEN,

        Plaintiff,

   v.

ANDREW SAUL,
Commissioner of Social Security,[1]

        Defendant.

_____/

Case No. 1:18-cv-01288-SKO

ORDER ON PLAINTIFF'S SOCIAL SECURITY COMPLAINT

(Doc. 1)

## I.    INTRODUCTION

On September 20, 2018, Plaintiff Pamela Green ("Plaintiff") filed a complaint under 42 U.S.C. § 405(g) seeking judicial review of a final decision of the Commissioner of Social Security (the "Commissioner" or "Defendant") denying her application for disability insurance benefits ("DIB") under Title II of the Social Security Act (the "Act"). The matter is currently before the Court on the parties' briefs, which were submitted, without oral argument, to the Honorable Sheila K. Oberto, United States Magistrate Judge.[2]

---

[1] On June 17, 2019, Andrew Saul became the Commissioner of the Social Security Administration. *See* https://www.ssa.gov/agency/commissioner.html (last visited by the court on September 12, 2019). He is therefore substituted as the defendant in this action. *See* 42 U.S.C. § 405(g) (referring to the "Commissioner's Answer"); 20 C.F.R. § 422.210(d) ("the person holding the Office of the Commissioner shall, in his official capacity, be the proper defendant").

[2] The parties consented to the jurisdiction of a U.S. Magistrate Judge. (Docs. 5, 8.)

## II.    FACTUAL BACKGROUND

On April 2, 2014, Plaintiff protectively filed an application for DIB payments,[3] alleging she became disabled on January 28, 2013, due to depression, bipolar disorder, arthritis, and cervical injury. (Administrative Record ("AR") 16, 19–20, 65, 100, 116, 221–22, 241.) Plaintiff was born on August 14, 1959 and was 54 years old as of the alleged onset date. (AR 63–64, 80, 192, 226, 247.) She has a GED and completed some college, has past work experience as an accounting clerk, and last worked full-time in 2013. (AR 64–65.)

### A.    Relevant Medical Evidence[4]

### 1.    Charles Douglass, LCSW

On August 1, 2012, Plaintiff established care with social worker Charles Douglass for treatment of her depression. (AR 695–700.) Plaintiff reported that she had suffered from depression for more than thirty years was prescribed Cymbalta and other medications, had seen therapists in the past, and had suicidal thoughts but never acted on them. (AR 695.) Plaintiff completed a depression survey in which he stated she had significant difficulty concentrating, "fears of cracking up or going crazy", and fears of criticism or disapproval, and had significant feelings of sadness, discouragement, low self-esteem, inferiority, guilt, indecisiveness, irritability, loss of interest in life, loss of motivation, poor self-image, and suicidal impulses. (AR 696–699.)

Plaintiff returned to Mr. Douglass on August 10, 2012 and August 24, 2012. (AR 693–94.) At those visits, Plaintiff reported she was "feeling better." (AR 693–94.) On September 7, 2012, Plaintiff reported her boyfriend had been arrested and she expected him to go to prison. (AR 692.) On September 27, 2012, Plaintiff stated she talked on the phone and wrote to her ex-boyfriend and sent him some books on recovery from addiction. (AR 692.) On October 10, 2012, she reported she was applying for new jobs and had been on vacation that week. (AR 692.)

---

[3] Plaintiff filed an initial disability application on April 2, 2013, which was denied initially on August 1, 2013. (*See* AR 16, 88–98, 122–24.) Plaintiff did not appeal the initial denial of her first application, and instead filed a second application on April 2, 2014, which was deemed a reopening of her initial claim. (*See* AR 16, 100–109.)
[4] As Plaintiff's assertions of error is limited to the ALJ's assessment of medical evidence and testimony related to Plaintiff's mental impairments and the resulting limitations (or lack thereof) included in Plaintiff's RFC assessment, only evidence relevant to those arguments is set forth below. (*See* Doc. 13 at 4) ("Plaintiff's assignment of error pertains to her mental impairments and therefore the following recitation of medical evidence will be limited to those impairments.").

On October 24, 2012, Plaintiff stated she was "feeling down," was prescribed a new depression medication and had increased her dosage of Cymbalta to 60 milligrams. (AR 690.) On November 9, 2012, Plaintiff reported she did not get interviews for the jobs she applied for, and was "disappointed and hurt," but that she did not feel ready to return to work anyway because she was "still feeling down and [was] unable to cope with work." (AR 690.)

### 2. Mark Tetz, M.D.

The record also contains treatment notes from 2012–2013 from Plaintiff's primary care physician Mark Tetz.[5] (AR 375–409, 503–510.) On June 6, 2012, Dr. Tetz noted that Plaintiff was diagnosed with depression and bipolar disorder and was prescribed Lamotrigine and Cymbalta. (AR 389.) Dr. Tetz noted that Plaintiff was "alert and oriented, cooperative, non-ill appearing," and "pleasant." (AR 390.) On July 26, 2012, Dr. Tetz observed that Plaintiff had no anxiety or sleep disturbances but did have depression and some suicidal ideation. (AR 387.) On October 23, 2012, Dr. Tetz noted that Plaintiff had no anxiety, no sleep disturbances, and no suicidal ideation. (AR 384.) On November 15, 2012, Dr. Tetz noted Plaintiff was "alert and oriented, cooperative, non-ill appearing," and "pleasant," but was "[t]earful discussing going back to work." (AR 382.)

On January 28, 2013, Plaintiff reported that she had a problem "with irritability and anger" and "got into trouble last week at work." (AR 509.) Plaintiff reported she "thought she was doing better, until last week," and felt "like she can't go back . . . to work now." (AR 509.) Dr. Tetz noted, however, that Plaintiff was "alert and oriented, cooperative, non-ill appearing, pleasant," made "good eye contact, normal speech, alert," and exhibited "appropriate mood and affect." (AR 509.) Dr. Tetz refilled Plaintiff's Lamotrigine and Cymbalta. (AR 509.)

On February 25, 2013, Plaintiff reported she felt "better since off work, less irritable now," but was "[n]ot able to go back to work yet" because she was "[w]orried about anger outbursts." (AR 507.) Dr. Tetz also stated that Plaintiff was "[no]t able to go back to" work and that her "disability" leave should "continue . . . until start of 5/2013." (AR 507.) However, Dr. Tetz also noted that Plaintiff was "alert and oriented, cooperative, non-ill appearing, pleasant," made "good eye contact, normal speech, alert," and exhibited "appropriate mood and affect." (AR 507.) On April 24, 2013,

---

[5] It is unclear when Plaintiff began treating with Dr. Tetz, but the record contains treatment notes from 2012–2013.

Dr. Tetz noted Plaintiff had normal affect, normal speech, appropriate mood, appropriate affect, and no thought disorder.  (AR 376.)

### 3. Family Healthcare Network

In December 2013, Plaintiff established care with the Family Healthcare Network.  (*See* AR 705–803.)  On December 19, 2013, Plaintiff saw physician assistant Christian Wigfall, and reported a history of depression and bipolar disorder, and requested prescription refills of Cymbalta and Lamotrigine.  (AR 708.)  Plaintiff returned on January 8, 2014, to meet with social worker Meredith Casares, MSW, and reported loss of interest in activities, low energy, difficulty concentrating and remembering, feeling hopeless, irritable, guilty, sad, and fatigued, and difficulty maintaining a job.  (AR 710.)  Ms. Casares assessed Plaintiff as suffering from Bipolar I disorder, depressive disorder, nondependent cannabis abuse, and major depressive disorder.  (AR 712.)

Plaintiff returned to see Ms. Casares on March 19, 2014.  (*See* AR 717.)  Plaintiff reported that she was having negative thoughts about how people view her and "has been more paranoid about how people are viewing her and interacting with her."  (AR 717.)  On April 18, 2014, Plaintiff stated to Ms. Casares that "overall things have been 'good'" but she had fears about her ability to concentrate and learn, had very high expectations for herself, and "links things that are out of her control to her worth."  (AR 719.)  Plaintiff returned on May 29, 2014, and reported that "she feels suicidal many times" and had "thought about veering off the road."  (AR 723.)  Plaintiff reported she had been called back for interviews for jobs she applied for but she decided not to go to the interviews.  (AR 723.)  Plaintiff stated she took a competency test for a job placement agency but did "so poorly," and contacted a lawyer about applying for disability.  (AR 723.)  Ms. Casares gave Plaintiff the number for the suicide prevention hotline and confirmed that Plaintiff would go to the emergency room if she had suicidal thoughts.  (AR 723.)

Plaintiff saw Mr. Wigfall on June 5, 2014 and reported increased depression and memory loss.  (AR 725.)  Mr. Wigfall noted that Plaintiff was "pleasant, alert, in no acute distress, well developed, [and] well nourished."  (AR 726.)  Mr. Wigfall also noted that Plaintiff was "emotionally upset" and "crying when discussing current situation."  (AR 726.)  Plaintiff returned to see physician assistant Dustin Wetmore on December 30, 2014.  (AR 730.)  Plaintiff reported worsened depression

and occasional suicidal thoughts, and said her "lack of money [was] her biggest source of anxiety and depression." (AR 730.) Plaintiff's depression medications were also re-filled. (AR 731.)

On April 22, 2015, Plaintiff reported "severe" depression, "mood swings every day," and intermittent suicidal ideation. (AR 732.) Plaintiff reported that before she stopped working in January 2013, she "had mood swings at work, had difficulty working with others," and had gone on "stress leave" once in 2012 and again in January 2013. (AR 732.) On May 27, 2015, Plaintiff reported she had been sexually assaulted by her boyfriend on February 22, 2015, and did not want to report it because she feared retaliation. (AR 738.) Plaintiff was reluctant to discuss what happened but generally reported "anxiety about the incident." (AR 739.)

On July 15, 2015, Plaintiff reported she had been "struggling with her stress and depression," and was going to see a rape counselor about her sexual assault. (*See* AR 742.) On September 2, 2015, Plaintiff reported her depression was "not well-controlled" and she had been on medications for "a long time for bipolar and depression." (AR 744.) Plaintiff reported "feeling very sad sometimes" and "had some suicidal thoughts recently, but . . . no intention of acting on them." (AR 744.) Plaintiff stated she also had intermittent "crying episodes" and reported "feeling tired frequently." (AR 744.) On September 9, 2015, Plaintiff reported she will "stay in bed for a few days and cry" and on those days she is "unable to get out of bed and complete anything." (AR 747.) On September 24, 2015, Plaintiff reported having bad days that caused her to be depressed, stay in bed all day, and consider suicide, and that she "often becomes overwhelmed and upset when she has her days that are difficult." (AR 751.)

On November 20, 2015, Plaintiff reported to Ms. Casares that nearly every day, she had little interest or pleasure in doing things; felt down, depressed or hopeless; had trouble falling or staying asleep, or slept too much; felt tired or had little energy; had poor appetite or over-ate; felt bad about herself; had trouble concentrating on things; moved very slowly or too quickly; and had thoughts of suicide. (AR 758.) Ms. Casares assessed that Plaintiff had severe depression. (AR 758.) On December 4, 2015, Ms. Casares again assessed that Plaintiff was severely depressed. (AR 760.)

On December 30, 2015, Plaintiff reported that only about half the time she had little interest or pleasure in doing things; felt down, depressed or hopeless; had trouble falling or staying asleep,

or slept too much; felt tired or had little energy; had poor appetite or over-ate; felt bad about herself; and had trouble concentrating. (AR 762.) Plaintiff reported that only on several days she moved very slowly or too quickly, and never had thoughts of suicide. (AR 762.) Ms. Casares assessed Plaintiff with moderately severe depression. (AR 762.)

On February 10, 2016, Plaintiff reported only for several days she had little interest or pleasure in doing things; felt down, depressed or hopeless; had trouble falling or staying asleep, or slept too much; felt tired or had little energy; had poor appetite or over-ate; felt bad about herself; and had trouble concentrating. (AR 767.) Ms. Casares assessed Plaintiff with only mild depression. (AR 767.) On March 9, 2016, April 8, 2016, and May 5, 2019, Ms. Casares again assessed Plaintiff with mild depression based on Plaintiff's complaints. (AR 769, 771, 773.) On June 9, 2016, Ms. Casares assessed Plaintiff with moderately severe depression. (AR 775.) On July 12, 2016, her depression was still assessed as moderately severe. (AR 882.) On August 5, 2016, Plaintiff's depression had improved to mild. (AR 884.) Finally, on December 16, 2016, Plaintiff's depression was assessed as moderately severe. (AR 892.)

### 4. Family Services of Tulare County

Plaintiff reported to Family Services of Tulare County for four sessions to discuss her February 2015 sexual assault and her mental impairments. (*See* AR 866.) On July 31, 2015, the therapist and clinical supervisor diagnosed Plaintiff with adjustment disorder, mixed anxiety and depressed mood, spouse or partner violence, sexual, parent-child related problem, and employment problem. (AR 866.) At the July 15, 2015 session, Plaintiff described the rape by her ex-boyfriend and stated that she felt "emotionally and psychologically troubled" but did not report the rape to police because she feared retaliation from the ex-boyfriend and "she had no evidence about the rape incident." (AR 868–69.) Plaintiff returned for two more sessions and reported she was "still bothered by the thought of the shame of rape" and was "afraid that people would blame her and reject her because of what had happened." (AR 871–73.)

### 5. Claudia Gonzalez, Psy.D.

In January 2017, Plaintiff established care with psychologist Claudia Gonzalez. (AR 894.) On January 31, 2017, Plaintiff reported to Dr. Gonzalez difficulties managing her symptoms of

anxiety and depression, and stated feeling "overwhelmed" and an increase in stress lately. (AR 894.) Plaintiff reported that she tended to "overthink certain situations" and felt like others did not like her, which caused her to have anxiety around other people. (AR 894.) Plaintiff reported she was still taking multiple medications for her mental impairments, including Cymbalta. (AR 894.) On March 3, 2017, Dr. Gonzalez noted that Plaintiff's symptoms of depression and anxiety had increased, she felt "tense and frustrated," had sleep disturbance, frequent racing thoughts, difficulties getting out of bed, and was currently taking Cymbalta, Lamotrigine, and Hydroxyzine. (AR 897.) On March 14, 2017, Dr. Gonzalez noted Plaintiff's symptoms had decreased because she was on a "mood stabilizer," but she still had feelings of paranoia, racing thoughts, sleep disturbance, and difficulty getting out of bed. (AR 900.)

On March 29, 2017, Plaintiff reported "she was feeling very angry" and had the same problems as reported at previous visits—paranoia, racing thoughts, sleep disturbance, and difficulty getting out of bed. (AR 903.) On April 13, 2017, Plaintiff reported similar symptoms and she "spoke extensively about overthinking and feeling nervous about a variety of different things." (AR 906.) Plaintiff stated she was not ready to return to work because of her symptoms. (AR 906.) On April 26, 2017, Plaintiff stated all her symptoms and stressors had increased, and she reported problems with her children. (AR 909.)

On April 13, 2017, Dr. Gonzalez completed a Medical Opinion Questionnaire regarding Plaintiff's mental impairments. (AR 860–62.) Dr. Gonzalez diagnosed Plaintiff with mood disorder with mixed features and borderline personality disorder. (AR 860.) Dr. Gonzalez opined that Plaintiff had poor or no ability to accept instructions and respond appropriately to criticism from supervisors, get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes, and deal with stress of semiskilled and skilled work. (AR 860–61.) Dr. Gonzalez opined that Plaintiff had fair ability to interact appropriately with the general public, maintain socially appropriate behavior, maintain attention for two hour segment, complete a normal workday, respond appropriately to changes in a work setting, and deal with normal work stress. (AR 860–61.)

Dr. Gonzalez opined that Plaintiff had good ability to use public transportation, sustain an ordinary routine without special supervision, work in coordination with others, make simple work-related decisions, perform at a consistent pace without an unreasonable number and length of rest periods, ask simple questions, and set realistic goals. (AR 860–61.) Dr. Gonzalez opined that Plaintiff had unlimited or very good ability to adhere to basic standards of neatness and cleanliness, travel in unfamiliar places, remember work-like procedures, understand, remember and carry out very short and simple instructions, maintain attention for two-hour segments, maintain regular attendance and be punctual within customary, usually strict tolerances, be aware of normal hazards and take appropriate precautions, understand and remember detailed instructions, and carry out detailed instructions. (AR 860–61.) Dr. Gonzalez also opined that Plaintiff's mental impairments would cause her to be absent from work about twice per month. (AR 861.)

### 6. Mary McDonald, Ph.D.

On September 16, 2014, and September 23, 2014, Plaintiff underwent a consultative examination with psychologist Mary McDonald. (AR 683–88.) During the interview portion, Plaintiff reported suffering from memory loss and concentration problems. (AR 684.) Plaintiff was "tearful and sad and cried several times during both interviews." (AR 684.) Dr. McDonald observed Plaintiff was "tearful, irritable, and very slow in responding to the tests." (AR 685.) Plaintiff reported feeling "overwhelmed, irritable, and sad," and reported memory loss. (AR 685.) Dr. McDonald noted Plaintiff was prescribed to take 60 milligrams of Cymbalta and 150 milligrams of Lamotrigine daily. (AR 685.)

Dr. McDonald opined that Plaintiff had symptoms of "a longstanding, long-term depressive disorder," and diagnosed her with unspecified depressive disorder, cannabis related disorder, and alcohol related disorder. (AR 687.) Dr. McDonald stated Plaintiff's "prognosis in terms of her ability to work is fair." (AR 688.) Dr. McDonald opined that Plaintiff's ability to perform all work-related functions was "unimpaired," except for her ability to accept instructions from supervisors and respond appropriately to criticism, which was rated "unknown," and her social judgment, which was rated as "mildly unimpaired." (AR 688.)

### 7. State Agency Physicians

State agency physician Harvey Bilik, Psy.D., reviewed the record and assessed Plaintiff's mental RFC on October 9, 2014. (AR 100–09.) Dr. Bilik opined that Plaintiff had affective disorders and had mild restrictions on activities of daily living, mild difficulties in maintaining social functioning, and mild difficulties in maintaining concentration, persistence or pace. (AR 107.) Upon reconsideration on January 16, 2015, another state agency physician, Elizabeth Covey, Psy.D., reviewed the record and affirmed Dr. Bilik's findings. (AR 111–20.)

### B. Administrative Proceedings

The Commissioner denied Plaintiff's application for benefits initially on October 9, 2014, and again on reconsideration on January 16, 2015. (AR 127–30, 132–36.) On February 3, 2015, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). (AR 138–39.)

On May 2, 2017, Plaintiff appeared with counsel and testified before an ALJ as to her alleged disabling conditions. (AR 58–86.) Plaintiff testified that she experiences symptoms of bipolar disorder, depression, arthritis, a cervical injury, and personality disorder. (AR 64–65.) She stated that she does not participate in any clubs, church, or activities with friends. (AR 65.) Plaintiff testified that she worked as an accountant for the County of Tulare from 2002–2013 until she retired after being on a leave of absence. (AR 65–66.) Plaintiff stated the leave of absence from work was referred to as "stress leave," and was due to her mental impairments, carpal tunnel surgery on her right hand, and cervical disc surgery. (AR 66.) Plaintiff testified her neck is stiff, and she has bad arthritis in her knees, elbows, and ankles. (AR 69.) As to her mental impairments, Plaintiff testified she would often have problems communicating with coworkers and others, which would result in discipline from her supervisors. (AR 74–75.) She testified her problems at work began around 2012 when she began having trouble concentrating, getting in altercations with coworkers, having mood swings, and crying every day. (AR 76–79.)

A Vocational Expert ("VE") testified at the hearing that Plaintiff had past work as an Accounting Clerk, Dictionary of Occupational Titles (DOT) code 216.482-010, which was

sedentary work with a specific vocational preparation (SVP)[6] of 5. (AR 82.) The ALJ asked the VE to consider a person of Plaintiff's age, education, and with her work background. (AR 82.) The VE was also to assume this person could lift and carry no more than ten pounds occasionally or frequently; had no sitting limits, but would need to stand and stretch every two hours; would need to rest her neck or cervical spine every two hours; had no postural or manipulative limitations; and could have occasional contact with the public. (AR 82–83.) The VE testified that such a person could perform Plaintiff's past relevant work as it was described by Plaintiff in her testimony, but could not perform the work as it is classified and described in the DOT. (AR 83.)

In a second hypothetical, the ALJ asked the VE to consider an individual with the limitations described in the first hypothetical except that the person was limited to rare "extreme movement to the far left or far right." (AR 84.) The VE testified that such a person could perform Plaintiff's past work as per Plaintiff's testimony, but could not perform Plaintiff's past relevant work as per the DOT. (AR 84.) In a third hypothetical the ALJ asked the VE to consider an individual with the same limitations described in the first two hypotheticals, except that the individual was limited to noncomplex work and routine tasks, and could have only occasional contact with coworkers. (AR 84.) The VE testified that the individual would not be able to perform Plaintiff's past relevant work, but may be able to perform "unskilled jobs at sedentary levels." (AR 84.)

Plaintiff's attorney asked the VE to consider a hypothetical individual that had the limitations described in the first hypothetical but that was off task for fifteen percent or more of an eight-hour work day or would miss two or more days of work per month, or could have no contact with the public. (AR 84–85.) The VE testified that the individual would not be able to perform any of Plaintiff's past relevant work. (AR 85.)

## C.    The ALJ's Decision

In a decision dated June 15, 2017, the ALJ found that Plaintiff was not disabled, as defined by the Act. (AR 16–33.) The ALJ conducted the five-step disability analysis set forth in 20 C.F.R.

---

[6] Specific vocational preparation (SVP), as defined in DOT, App. C, is the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation. DOT, Appendix C – Components of the Definition Trailer, 1991 WL 688702 (1991). Jobs in the DOT are assigned SVP levels ranging from 1 (the lowest level – "short demonstration only") to 9 (the highest level – over 10 years of preparation). *Id*.

§ 404.1520. (AR 19–32.) The ALJ decided that Plaintiff had not engaged in substantial gainful activity since the alleged onset date (step one). (AR 19.) At step two, the ALJ found that Plaintiff had the severe impairment of disorder of the cervical spine (status post-surgery). (AR 19.) The ALJ further found Plaintiff had no limitations understanding, remembering, or applying information; mild to moderate limitations interacting with others; mild limitations in concentration, persistence, and pace; and no limitation in adapting or managing herself. (AR 20.) The ALJ therefore found that Plaintiff's mental impairments, including her bipolar disorder and depression, were non-severe. (AR 19.) The ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the Listings (step three). (AR 25.)

The ALJ then assessed Plaintiff's RFC and applied the RFC assessment at steps four and five. *See* 20 C.F.R. § 404.1520(a)(4) ("Before we go from step three to step four, we assess your residual functional capacity … We use this residual functional capacity assessment at both step four and step five when we evaluate your claim at these steps."). The ALJ determined that Plaintiff retained the RFC:

> to perform sedentary work as defined in 20 CFR [§] 404.1567(a), provided that: [Plaintiff] can lift and carry no more than 10 pounds occasionally or frequently; [Plaintiff] can stand and/or walk for no more than 2 hours in an 8-hour workday; [Plaintiff] has no sitting limitations but would need the ability to stand and stretch every 2 hours for 15 minutes falling within normal breaks and lunches; [Plaintiff] needs to rest her neck every 2 hours falling within normal breaks and lunches; [Plaintiff] can frequently climb, balance, stoop, kneel, crouch, and crawl; [Plaintiff] can frequently perform handling and fingering bilaterally; and [Plaintiff] is limited to occasional contact with the public.

(AR 26.) Although the ALJ recognized that Plaintiff's impairments "could reasonably be expected to cause the alleged symptoms[,]" he rejected Plaintiff's subjective testimony as "not entirely consistent with the medical evidence and other evidence in the record[.]" (AR 27.) At step five, the ALJ found that Plaintiff could perform past relevant work as an accounting clerk. (AR 32.)

Plaintiff sought review of this decision before the Appeals Council, which denied review on July 18, 2018. (AR 1–6.) Therefore, the ALJ's decision became the final decision of the Commissioner. 20 C.F.R. § 404.981.

# III.    LEGAL STANDARD

## A.    Applicable Law

An individual is considered "disabled" for purposes of disability benefits if he or she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). However, "[a]n individual shall be determined to be under a disability only if [her] physical or mental impairment or impairments are of such severity that [s]he is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." *Id.* § 423(d)(2)(A).

"The Social Security Regulations set out a five-step sequential process for determining whether a claimant is disabled within the meaning of the Social Security Act." *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999) (citing 20 C.F.R. § 404.1520). The Ninth Circuit has provided the following description of the sequential evaluation analysis:

> In step one, the ALJ determines whether a claimant is currently engaged in substantial gainful activity. If so, the claimant is not disabled. If not, the ALJ proceeds to step two and evaluates whether the claimant has a medically severe impairment or combination of impairments. If not, the claimant is not disabled. If so, the ALJ proceeds to step three and considers whether the impairment or combination of impairments meets or equals a listed impairment under 20 C.F.R. pt. 404, subpt. P, [a]pp. 1. If so, the claimant is automatically presumed disabled. If not, the ALJ proceeds to step four and assesses whether the claimant is capable of performing her past relevant work. If so, the claimant is not disabled. If not, the ALJ proceeds to step five and examines whether the claimant has the [RFC] . . . to perform any other substantial gainful activity in the national economy. If so, the claimant is not disabled. If not, the claimant is disabled.

*Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005). "If a claimant is found to be 'disabled' or 'not disabled' at any step in the sequence, there is no need to consider subsequent steps." *Tackett*, 180 F.3d at 1098 (citing 20 C.F.R. § 404.1520).

"The claimant carries the initial burden of proving a disability in steps one through four of the analysis." *Burch*, 400 F.3d at 679 (citing *Swenson v. Sullivan*, 876 F.2d 683, 687 (9th Cir. 1989)). "However, if a claimant establishes an inability to continue her past work, the burden shifts

12

to the Commissioner in step five to show that the claimant can perform other substantial gainful work." *Id.* (citing *Swenson*, 876 F.2d at 687).

**B.    Scope of Review**

"This court may set aside the Commissioner's denial of disability insurance benefits [only] when the ALJ's findings are based on legal error or are not supported by substantial evidence in the record as a whole." *Tackett*, 180 F.3d at 1097 (citation omitted). "Substantial evidence is defined as being more than a mere scintilla, but less than a preponderance." *Edlund v. Massanari*, 253 F.3d 1152, 1156 (9th Cir. 2001) (citing *Tackett*, 180 F.3d at 1098). "Put another way, substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

"This is a highly deferential standard of review …" *Valentine v. Comm'r of Soc. Sec. Admin.*, 574 F.3d 685, 690 (9th Cir. 2009). "The ALJ's findings will be upheld if supported by inferences reasonably drawn from the record." *Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008) (citation omitted). Additionally, "[t]he court will uphold the ALJ's conclusion when the evidence is susceptible to more than one rational interpretation." *Id.*; *see, e.g.*, *Edlund*, 253 F.3d at 1156 (citations omitted) ("If the evidence is susceptible to more than one rational interpretation, the court may not substitute its judgment for that of the Commissioner.").

Nonetheless, "the Commissioner's decision 'cannot be affirmed simply by isolating a specific quantum of supporting evidence.'" *Tackett*, 180 F.3d at 1098 (quoting *Sousa v. Callahan*, 143 F.3d 1240, 1243 (9th Cir. 1998)). "Rather, a court must 'consider the record as a whole, weighing both evidence that supports and evidence that detracts from the [Commissioner's] conclusion.'" *Id.* (quoting *Penny v. Sullivan*, 2 F.3d 953, 956 (9th Cir. 1993)).

Finally, courts "may not reverse an ALJ's decision on account of an error that is harmless." *Molina v. Astrue*, 674 F.3d 1104, 1111 (9th Cir. 2012) (citing *Stout v. Comm'r, Soc. Sec. Admin.*, 454 F.3d 1050, 1055–56 (9th Cir. 2006)). Harmless error "exists when it is clear from the record that 'the ALJ's error was inconsequential to the ultimate nondisability determination.'" *Tommasetti*, 533 F.3d at 1038 (quoting *Robbins*, 466 F.3d at 885). "[T]he burden of showing that an error is harmful normally falls upon the party attacking the agency's determination." *Shinseki v. Sanders*,

556 U.S. 396, 409 (2009) (citations omitted).

## IV.    DISCUSSION

Plaintiff contends that the ALJ erred in finding at step two that Plaintiff's mental impairments were not severe, because the ALJ's finding was contradicted by the medical evidence and because the ALJ improperly partially rejected Dr. Gonzalez's opinion,[7] and that the ALJ failed to articulate specific, clear and convincing reasons for discounting Plaintiff's testimony regarding her subjective complaints.  (*See* Doc. 13 at 14–25.)  Defendant counters that the ALJ's step two determination, evaluation of Dr. Gonzalez's opinion, and credibility determination were appropriate.  (Doc. 16 at 8–30.)  The Court agrees with Defendant's position.

**A.    The ALJ Did Not Err in Her Consideration of Plaintiff's Mental Impairments.**

**1.    The ALJ Properly Found Plaintiff's Mental Impairments Were Non-severe.**

Legal Standard

"At step two of the five-step sequential inquiry, the Commissioner determines whether the claimant has a medically severe impairment or combination of impairments."  *Smolen v. Chater*, 80 F.3d 1273, 1289–90 (9th Cir. 1996) (citing *Bowen v. Yuckert*, 482 U.S. 137, 140–41 (1987)).  "[A]t the step two inquiry, . . . the ALJ must consider the combined effect of all of the claimant's impairments on her ability to function, without regard to whether each alone was sufficiently severe."  *Id.* at 1290 (citing 42 U.S.C. § 423(d)(2)(B) and TITLES II & XVI: THE SEQUENTIAL EVALUATION PROCESS, Social Security Ruling ("SSR") 86-8 (S.S.A. 1986)).

"[A]n impairment is not severe if it does not significantly limit [the claimant's] . . . ability to do basic work activities."  *Id.* at 1290 (citing 20 C.F.R. §§ 404.1520(c) & 404.1521(a)).  "[B]asic work activities are the abilities and aptitudes necessary to do most jobs."  TITLES II & XVI: MED. IMPAIRMENTS THAT ARE NOT SEVERE, SSR 85-28 (S.S.A. 1985).  Examples of "basic work activities" include (1) "[p]hysical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling," (2) "[c]apacities for seeing, hearing, and speaking," (3) "[u]nderstanding, carrying out, and remembering simple instructions," (4) "[u]se of judgment," (5)

---

[7] For clarity, the Court discusses Plaintiff's assertions of error regarding the Step Two determination generally and regarding the ALJ's evaluation of Dr. Gonzalez's opinion separately.

"[r]esponding appropriately to supervision, co-workers and usual work situations," and (6) "[d]ealing with changes in a routine work setting." 20 C.F.R. § 416.922(b).

"An impairment or combination of impairments can be found 'not severe' only if the evidence establishes a slight abnormality that has 'no more than a minimal effect on an [individual's] ability to work.'" *Smolen*, 80 F.3d at 1290 (quoting SSR 85–28). Additionally, "an ALJ may find that a claimant lacks a medically severe impairment or combination of impairments only when his conclusion is 'clearly established by medical evidence.'" *Webb v. Barnhart*, 433 F.3d 683, 687 (9th Cir. 2005) (citing SSR 85–28); *cf. Ukolov v. Barnhart*, 420 F.3d 1002, 1006 (9th Cir. 2005) (finding that the claimant "failed to meet his burden of establishing disability" where "none of the medical opinions included a finding of impairment, a diagnosis, or objective test results").

"Great care should be exercised in applying the not severe impairment concept." SSR 85–28. "The Commissioner has stated that '[i]f an adjudicator is unable to determine clearly the effect of an impairment or combination of impairments on the individual's ability to do basic work activities, the sequential evaluation should not end with the not severe evaluation step.'" *Webb*, 433 F.3d at 687 (alteration in original) (quoting SSR 85–28). Ultimately, "[t]he severity regulation increases the efficiency and reliability of the evaluation process by identifying at an early stage those claimants whose medical impairments are so slight that it is unlikely they would be found to be disabled even if their age, education, and experience were taken into account." *Yuckert*, 482 U.S. at 153. In other words, "the step-two inquiry is a de minimis screening device to dispose of groundless claims." *Smolen*, 80 F.3d at 1290 (*citing Yuckert*, 482 U.S. at 153–54).

Nonetheless, an ALJ may properly find an impairment non-severe at step two if there is substantial evidence that the impairment does not have a significant effect on the plaintiff's ability to work, *Smolen*, 80 F.3d at 1290, and "[t]he plaintiff has the burden of establishing the severity of the impairment." *Cookson v. Comm'r of Soc. Sec.*, No. 2:12–cv–2542–CMK, 2014 WL 4795176, at *2 (E.D. Cal. Sept. 25, 2014); *see, e.g.*, *Webb*, 433 F.3d at 686 (stating an impairment at step two "may be found not severe *only if* the evidence establishes a slight abnormality that has no more than a minimal effect on an individual's ability to work") (emphasis in original; international quotation marks omitted); *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005) ("The claimant carries the

initial burden of proving a disability in steps one through four of the analysis.") (citing *Swenson v. Sullivan*, 876 F.2d 683, 687 (9th Cir. 1989).

Analysis

Plaintiff contends that the ALJ erred in finding that Plaintiff's mental impairments were non-severe because her finding was contradicted by the medical evidence. (Doc. 13 at 15–23.) The Court disagrees and finds that the ALJ properly considered and evaluated Plaintiff's mental impairments.

In evaluating the severity of Plaintiff's mental impairments, the ALJ exhaustively analyzed the impairments under each of the four functional areas that make up the paragraph B criteria. (AR 19–22.) First, the ALJ found that Plaintiff was not limited in understanding, remembering, or applying information. (AR 19–20.) The ALJ noted that in a functional report submitted on June 14, 2013, Plaintiff stated she was "pretty good" at following written instructions, and consistently acknowledged an ability to pay bills, count change, and handle financial accounts. (AR 20) (citing AR 261–68; 279–92). Next, the ALJ found that Plaintiff had mild to moderate limits interacting with others. (AR 20.) The ALJ noted than in a functional report, Plaintiff acknowledged that her ability to interact with supervisors was "OK," and that "she shops in stores and spends time interacting with others on Facebook or the phone, and reported spending time with her grandchildren." (AR 20) (citing AR 261–68; 279–92).

The ALJ also found Plaintiff had mild limitation in concentration, persistence, and pace, noting that Plaintiff has consistently reported handling changes in routine, and can pay attention for between ten to thirty minutes. (AR 20.) Finally, the ALJ found Plaintiff was not limited in managing herself because she "denied needing any reminders to take care of personal needs or grooming" and had "no problems with personal care activities." (AR 20.) The ALJ also noted that "[o]ver her longitudinal medical history, the claimant has consistently demonstrated the ability to inform medical professionals or community support personnel of her current symptom complaints or needs as well as details regarding her past medical or personal history." (AR 20) (citations omitted).

The ALJ also surveyed the medical evidence and observed that Plaintiff's mental symptoms generally waxed and waned over time. (AR 21.) The ALJ noted that Dr. Tetz consistently observed Plaintiff to be "alert and oriented, cooperative, non-ill appearing, pleasant," made "good eye contact, normal speech, alert," and exhibited "appropriate mood and affect." (AR 21) (citations omitted). The ALJ also noted the inconsistent evaluations from other providers. (*See* AR 22.) In finding Plaintiff's mental impairments non-severe, the ALJ explained:

> Under the totality of the evidence, I find that [Plaintiff's] mental impairments (including but not limited to depressive disorder, anxiety disorder, and bipolar disorder) have no more than minimally impaired her ability to perform work activities over any period of at least 12 consecutive months since the date of alleged onset of disability. Therefore, these impairments are non-severe.

(AR 22.)

The Court finds that the ALJ's step two determination was supported by substantial evidence in the record and an extensive discussion and analysis of the paragraph B criteria.[8] The ALJ properly analyzed Plaintiff's mental impairments in each of the four functional areas, cited to numerous treatment records and self-reports from Plaintiff to support her analysis, and provided multiple proper reasons for finding Plaintiff's mental impairments did not have a significant impact on her ability to work. (AR 19–22); *Smolen*, 80 F.3d at 1290; *see also Fry v. Commissioner of Social Security*, No 2:15-cv-2023-KJN (PS), 2017 WL 999459, at *3 (E.D. Cal. Mar. 15, 2017) ("[T]he ALJ relied on substantial evidence from the record to support her reasoning and did not err at step two in finding plaintiff's plantar fasciitis to be a non-severe impairment"); *Kaur v. Saul*, No. 2:18-cv-00933-AC, 2019 WL 4013601, at *4 (E.D. Cal. Aug. 26, 2019).

Further, any asserted error at step two is harmless because the ALJ proceeded to consider the effects of Plaintiff's mental impairments at the subsequent steps in the process. (*See* AR 22–32.) The ALJ also explicitly stated in her decision that she considered all Plaintiff's medically

---

[8] The Court also finds the ALJ properly partially rejected Dr. Gonzalez's opinion, as explained below.

determinable impairments, severe and non-severe, and all medical evidence in determining Plaintiff's RFC, and in fact included mental limitations in her RFC. (*See* AR 22, 24, 26.) Thus, even assuming *arguendo* that the ALJ erred at step two, that error would be harmless. *See Lewis v. Astrue*, 498 F.3d 909, 911 (9th Cir. 2007); *Fry*, 2017 WL 999459, at *3; *Kaur*, 2019 WL 4013601, at *4.

## 2. The ALJ Properly Partially Rejected Dr. Gonzalez's Opinion.

<u>Legal Standard</u>

"If . . . a treating [physician's] opinion . . . is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record, [the Commissioner] will give it controlling weight." 20 C.F.R. § 404.1527(c)(2); *cf. Reddick*, 157 F.3d at 725 ("Where the treating doctor's opinion is not contradicted by another doctor, it may be rejected only for clear and convincing reasons supported by substantial evidence in the record." (citation omitted)). "If there is 'substantial evidence' in the record contradicting the opinion of the treating physician, the opinion of the treating physician is no longer entitled to 'controlling weight.'" *Orn*, 495 F.3d at 632 (quoting 20 C.F.R. § 404.1527(d)(2)).

"If a treating physician's opinion is not given 'controlling weight' because it is not 'well-supported' or because it is inconsistent with other substantial evidence in the record, the [Commissioner] considers specified factors in determining the weight it will be given." *Id.* at 631. These factors include (1) the "[l]ength of the treatment relationship and the frequency of examination;" (2) the "[n]ature and extent of the treatment relationship;" (3) the "[s]upportability" of the opinion;" (4) the "[c]onsistency" of the opinion "with the record as a whole;" (5) whether the opinion is from "a specialist about medical issues related to his or her area of specialty;" and (6) "any other factors [the claimant] or others bring to [the ALJ's] attention, or of which [the ALJ is] aware, which tend to support or contradict the opinion." 20 C.F.R. § 404.1527(c)(2)–(6).

Further, "[e]ven if the treating doctor's opinion is contradicted by another doctor, the ALJ may not reject this opinion without providing 'specific and legitimate reasons' supported by substantial evidence in the record." *Reddick*, 157 F.3d at 725 (quoting *Lester*, 81 F.3d at 830). *See also Trevizo v. Berryhill*, 871 F.3d 664, 675 (9th Cir. 2017) (citing *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008)). "This can be done by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." *Id.* (citing *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989)); *see, e.g.*, *Chaudhry v. Astrue*, 688 F.3d 661, 671 (9th Cir. 2012) ("The ALJ need not accept the opinion of any physician, including a treating physician, if that opinion is brief, conclusory, and inadequately supported by clinical findings." (quoting *Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1228 (9th Cir. 2009))); *Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F.3d 595, 600 (9th Cir. 1999) ("Opinions of a nonexamining, testifying medical advisor may serve as substantial evidence when they are supported by other evidence in the record and are consistent with it." (citing *Andrews v. Shalala*, 53 F.3d 1035, 1041 (9th Cir. 1995))); *Matney on Behalf of Matney v. Sullivan*, 981 F.2d 1016, 1020 (9th Cir. 1992) (noting that "inconsistencies and ambiguities" in a treating physician's opinion "represent specific and legitimate reasons for" rejecting the opinion). "The ALJ must do more than offer his conclusions." *Reddick*, 157 F.3d at 725. "He must set forth his own interpretations and explain why they, rather than the doctors', are correct." *Id.* (citing *Embrey v. Bowen*, 849 F.2d 418, 421–22 (9th Cir. 1988)).

<u>Analysis</u>

The record reflects that Dr. Gonzalez treated Plaintiff from approximately January 2017 until at least April 2017. (*See* AR 894–909.) Dr. Gonzalez completed a Medical Opinion Questionnaire regarding Plaintiff's mental impairments on April 13, 2017. (AR 860–62.) Dr. Gonzalez's opinion is a checklist-style form where she checked boxes rating Plaintiff's functional ability and gave no information regarding why a particular box was checked. (*See* AR 860–62.)

As to the ALJ's partial rejection of Dr. Gonzalez's opinion, the ALJ stated:

> Dr. Gonzalez has opined that the claimant has "unlimited", "very good", or "good" ability in most mental functional particulars, including but not limited to understanding, remember and carrying out both simple and detailed instructions. However, she stated that the claimant has "poor" or no ability to accept instructions and respond appropriately to criticism from supervisors, deal with the stress of semiskilled and skilled work, and get along with co-workers and peers without unduly distracting them or exhibiting behavioral extremes. Dr. Gonzalez also opined that the claimant would be absent from work "about twice a month" in any given work month due to her impairments . . . Dr. Gonzalez has served as a treating medical provider. I give great weight to her various assessments that the claimant is not significantly limited in a number of mental functional particulars (including the ability to understand, remember and carry out detailed as well as simple instructions), as the balance of the evidence supports those conclusions for all of the reasons previously detailed in weighing the opinions of Dr. McDonald and the state agency psychiatrist and psychologists. However, for all of those same reasons, Dr. Gonzalez's severely restrictive assessments pertaining to claimant's social functioning abilities, her ability to deal with the stress of semiskilled and skilled work, and her ability to maintain workplace attendance are not reasonably supported by the balance of the evidence, and are given little weight.

(AR 30–31.) The ALJ adopted the findings of the State agency physicians and consultative examiner Dr. McDonald and gave their opinions "great weight." (AR 30.) The ALJ partially discounted Dr. Gonzalez's opinion because a few portions of the opinion were inconsistent with other medical evidence and opinions in the record. (AR 30–31.) Because Dr. Gonzalez's opinion was contradicted by other medical opinions, the ALJ was required to state "specific and legitimate" reasons, supported by substantial evidence, for partially rejecting Dr. Gonzalez's opinion. *Trevizo*, 871 F.3d at 675 (citing *Ryan*, 528 F.3d at 1998); *see also Lester*, 81 F.3d at 830.

The ALJ properly gave little weight to the parts of Dr. Gonzalez's opinion that were inconsistent with the medical evidence and other medical opinions in the record, and great weight to the parts of Dr. Gonzalez's opinion that were consistent with the rest of the evidence in the record. For example, the ALJ gave great weight to Dr. Gonzalez's assessment that Plaintiff is not significantly limited in her ability to understand, remember and carry out detailed instructions because that assessment is consistent with the assessments of the State agency physicians. (AR 30–31); (*see* AR 107, 111–20.) The ALJ gave little weight to Dr. Gonzalez's "severely restrictive

assessments" of Plaintiff in other areas because they were not supported by the medical evidence. (AR 31.) For example, the State agency physicians found that Plaintiff had only mild restrictions on activities of daily living, mild difficulties in maintaining social functioning, and mild difficulties in maintaining concentration, persistence or pace. (AR 107, 111–20.)

Opinions of non-examining physicians "may serve as substantial evidence when they are supported by other evidence in the record and are consistent with it." *Andrews*, 53 F.3d at 1041; *Tonapetyan*, 242 F.3d at 1149. The opinions the State agency physicians are consistent with and supported by the medical evidence in the record—for example, Ms. Casares' multiple assessments that Plaintiff had only mild depression based on Plaintiff's complaints. (*See, e.g.,* AR 769, 771, 773.) Accordingly, because evidence in the medical record supports the State agency physicians' opinions and the ALJ must resolve conflicts and ambiguities in the medical record, *Andrews*, 53 F.3d at 1039, the ALJ did not err by relying on the opinions of the State agency physicians and discrediting parts of Dr. Gonzalez's opinion inconsistent with the medical evidence. *Corder v. Comm'r*, No. 2:16-cv-1969-KJN, 2018 WL 466265, at *4 (E.D. Cal. Jan. 18, 2018) (holding the ALJ properly relied on contrary opinions from state agency physicians to discount a treating physician's opinion where the state agency physicians' opinions were consistent with the medical record); *Lott v. Berryhill*, No 2:17-cv-00986-KJN, 2018 WL 4292247, at *4 (E.D. Cal. Sept. 7, 2018) (same); *Delgadillo v. Colvin*, No. 1:12-cv-703 GSA, 2013 WL 5476413, at *7 (E.D. Cal. Sept. 30, 2013) (same).

Plaintiff cites *Trevizo* and contends that because the ALJ did not explicitly mention and analyze each of the factors in § 404.1527 in her partial rejection of Dr. Gonzalez's opinion, this constitutes reversible error. (Doc. 13 at 18–19.) The Court disagrees. First, the ALJ mostly accepted Dr. Gonzalez's opinion, and only rejected a few portions, as opposed to the "outright rejection" in *Trevizo*. *See* 871 F.3d at 676. Next, the ALJ discussed the treating relationship, (*see*

AR 30–31), the length and number of treatment visits, (*see* AR 24), and the supportability of the opinion relative to the rest of the medical evidence in the record, (*see* AR 30–31).

Finally, Dr. Gonzalez's opinion was given in the form of a checklist, with no information as to why any particular box was checked. (*See* AR 860–62.) "A treating physician's opinion that is 'conclusory or brief' and lacks support of clinical findings may be rejected by an ALJ." *Gomez v. Berryhill*, No. 1:17-cv-01035-JLT, 2019 WL 852118, at *8 (E.D. Cal. Feb. 22, 2019) (quoting *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989)); *see also Crane v. Shalala*, 76 F.3d 251, 251 (9th Cir. 1996) ("The ALJ permissibly rejected . . . check-off reports that did not contain any explanation of the bases of their conclusion"); *Batson v. Comm'r of the Soc. Sec. Admin.*, 359 F.3d 1190, 1195 (9th Cir. 2003). Thus, the ALJ properly rejected portions of Dr. Gonzalez's checklist opinion that had no accompanying explanation for why a box was checked. (*See* AR 860–62.)

Therefore, the Court finds that the ALJ's consideration of Plaintiff's mental impairments was proper, including the step two analysis and evaluation of Dr. Gonzalez's opinion.

## B.    The ALJ Did Not Err in Her Credibility Determination

### 1.    Legal Standard

In evaluating the credibility of a claimant's testimony regarding subjective pain, an ALJ must engage in a two-step analysis. *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009). First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment that could reasonably be expected to produce the pain or other symptoms alleged. *Id.* The claimant is not required to show that her impairment "could reasonably be expected to cause the severity of the symptom [he] has alleged; [he] need only show that it could reasonably have caused some degree of the symptom." *Id.* (quoting *Lingenfelter v. Astrue*, 504 F.3d 1028, 1036 (9th Cir. 2007)). If the claimant meets the first test and there is no evidence of malingering, the ALJ can only reject the claimant's testimony about the severity of the symptoms if he gives "specific, clear and convincing reasons" for the rejection. *Id.* As the Ninth Circuit has explained:

> The ALJ may consider many factors in weighing a claimant's credibility, including (1) ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid; (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; and (3) the claimant's daily activities. If the ALJ's finding is supported by substantial evidence, the court may not engage in second-guessing.

*Tommasetti*, 533 F.3d at 1039 (citations and internal quotation marks omitted); *see also Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1226–27 (9th Cir. 2009); 20 C.F.R. § 404.1529. Other factors the ALJ may consider include a claimant's work record and testimony from physicians and third parties concerning the nature, severity, and effect of the symptoms of which he complains. *Light v. Social Sec. Admin.*, 119 F.3d 789, 792 (9th Cir. 1997).

The clear and convincing standard is "not an easy requirement to meet" and it "is the most demanding [standard] required in Social Security cases." *Garrison*, 759 F.3d at 1015 (citation omitted). "General findings are insufficient" to satisfy this standard. *Burrell v. Colvin*, 775 F.3d 1133, 1138 (9th Cir. 2014) (quoting *Lester v. Chater*, 81 F.3d 821, 834 (9th Cir. 1995)). "[R]ather, the ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints." *Id.* (quoting *Lester*, 81 F.3d at 834); *see, e.g., Vasquez v. Astrue*, 572 F.3d 586, 592 (9th Cir. 2008) ("To support a lack of credibility finding, the ALJ [is] required to 'point to specific facts in the record which demonstrate that [the claimant] is in less pain than she claims.'" (quoting *Dodrill v. Shalala*, 12 F.3d 915, 918 (9th Cir. 1993)); *cf. Burrell*, 775 F.3d at 1138 (stating that the Ninth Circuit's "decisions make clear that [courts] may not take a general finding . . . and comb the administrative record to find specific" support for the finding).

### 2.    Analysis

The ALJ found Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms." (AR 27.) The ALJ also found that "[Plaintiff's] statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record[.]" (AR 27.) Since

the ALJ found Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms," the only remaining issue is whether the ALJ provided "specific, clear and convincing reasons" for his adverse credibility finding. *See Vasquez*, 572 F.3d at 591.

The ALJ found that Plaintiff's symptom statements were less than credible because (1) her alleged symptoms were inconsistent with the medical evidence including statements she made to treatment providers (AR 27–29); and (2) her activities of daily living were inconsistent with her alleged mental symptoms (AR 29–30). Plaintiff contends the ALJ erred in her credibility finding because the medical evidence supports Plaintiff's alleged mental symptoms and because the ALJ failed to sufficiently account for Plaintiff's "stellar work history." (Doc. 13 at 24.) The Court disagrees.

### a.    Objective Evidence of Record

The ALJ discounted Plaintiff's testimony regarding her mental impairments in part because her alleged symptoms were inconsistent with the objective evidence of record, including relevant medical evidence and statements made to treatment providers during the application process. (*See* AR 27–29.) The Court finds this is a valid clear and convincing reason to discredit Plaintiff's testimony regarding her mental impairments.

"[T]he Ninth Circuit has repeatedly emphasized that, 'in evaluating the credibility of pain testimony after a claimant produces objective medical evidence of an underlying impairment, an ALJ may not reject a claimant's subjective complaints based solely on a lack of medical evidence to fully corroborate the alleged severity of pain.'" *Ondracek v. Comm'r of Soc. Sec.*, No. 1:15-cv-01308-SKO, 2017 WL 714374, at *8 (E.D. Cal. Feb. 22, 2017) (quoting *Burch*, 400 F.3d at 680); *see, e.g., Rollins v. Massanari*, 261 F.3d 853, 857 (9th Cir. 2001) ("[S]ubjective pain testimony cannot be rejected on the sole ground that it is not fully corroborated by objective medical evidence …"); *see also* SSR 96–7p ("An individual's statements about the intensity and persistence of pain or other symptoms or about the effect the symptoms have on his or her ability to work may not be

disregarded solely because they are not substantiated by objective medical evidence."). Nonetheless, "lack of medical evidence … is a factor that the ALJ can consider in his credibility analysis." *Burch*, 400 F.3d at 681.  Stated differently, "[a]lthough the inconsistency of objective findings with subjective claims may not be the sole reason for rejecting subjective complaints of pain, it is one factor which may be considered with others." *Salas v. Colvin*, No. 1:13-cv-00429-BAM, 2014 WL 4186555, at *6 (E.D. Cal. Aug. 21, 2014) (citations omitted).

Here, the ALJ cited numerous treatment notes and self-reports from Plaintiff that contradicted her testimony at the hearing regarding her mental impairments.  (AR 27–29.)  For example, although Plaintiff testified she was unable to work due to her mental impairments, Dr. Tetz noted that Plaintiff reported being unable to work because of shoulder pain, but did not mention any mental impairment-related reason.  (*See* AR 29) (citation omitted).  The ALJ also noted that the record reflects multiple inconsistent statements Plaintiff made to different treatment providers throughout the course of treatment.  (*See* AR 29.)  For example, Plaintiff testified that she was never offered a job in 2014 or 2015, but Dr. McDonald reported that Plaintiff told her she was offered but declined a job during that time period.  (*See* AR 29) (citation omitted).  Thus, the Court finds that the ALJ properly considered the inconsistency of Plaintiff's testimony with the objective evidence in determining that Plaintiff's testimony was less than credible.  *See Salas*, 2014 WL 4186555, at *6.

### b.    Activities of Daily Living

The ALJ also found that Plaintiff's reported activities of daily living were inconsistent with her alleged disabling symptoms.  (AR 29–30.)  It is appropriate for an ALJ to consider a claimant's activities that undermine claims of totally disabling pain in making the credibility determination. *See Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989); *Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F.3d 595, 600 (9th Cir. 1999); *Rollins v. Massanari*, 261 F.3d 853, 857 (9th Cir. 2001); *see also Thomas v. Barnhart*, 278 F.3d 947, 958–59 (9th Cir. 2002) (An ALJ may suppor ta determination

that the claimant was not entirely credible by identifying inconsistencies between the claimant's complaints and the claimant's activities of daily living.).  It is well-established that a claimant need not "vegetate in a dark room" to be deemed eligible for benefits.  *Cooper v. Bowen*, 815 F.2d 557, 561 (9th Cir. 1987).  However, if a claimant is able to spend a substantial part of his day engaged in pursuits involving the performance of physical functions that are transferable to a work setting, a specific finding as to this fact may be sufficient to discredit an allegation of disabling excess pain. *Fair*, 885 F.2d at 603.  "Even where the claimant's activities suggest some difficulty functioning, they may be grounds for discrediting the claimant's testimony to the extent that they contradict claims of a totally debilitating impairment."  *Molina*, 674 F.3d at 1113.

The ALJ noted that Plaintiff reported that she "shops in stores, prepares meals, and performs household chores such as light cleaning, laundry, and watering flowers and shrubs," "interacting with others on Facebook or the phone, and spending time with her grandchildren."  (AR 29.)  The ALJ further noted that Plaintiff has repeatedly acknowledged her ability to drive, pay bills, count change, and handle financial accounts.  (AR 29.)  The ALJ stated that these activities "suggest that she is more functional than she has alleged."  (AR 30.)  The Court finds that the ALJ properly found that these activities "contradict claims of a totally debilitating impairment" and Plaintiff's claims that she is unable to work due to her mental impairments.  *See Molina*, 674 F.3d at 1113.  Therefore, the Court finds the ALJ properly discounted Plaintiff's credibility.[9]

## V.  CONCLUSION AND ORDER

Based on the foregoing, the Court finds that the ALJ's decision is supported by substantial evidence and is therefore AFFIRMED.  The Clerk of this Court is DIRECTED to enter judgment in favor of Defendant Andrew Saul, Commissioner of Social Security, and against Plaintiff.

---

[9] Plaintiff also contends that the ALJ "failed to even acknowledge Plaintiff's stellar work history."  (Doc. 13 at 23.) However, the ALJ did discuss Plaintiff's work history elsewhere in her opinion, (*see* AR 32), and an ALJ is not required to explicitly discuss work history in determining credibility, *see* 20 C.F.R. § 404.1529(c)(3).  The Court finds the ALJ properly discounted Plaintiff's credibility and did not improperly fail to acknowledge Plaintiff's work history.

IT IS SO ORDERED.

Dated:   **January 6, 2020**                    /s/ _Sheila K. Oberto_
                                         UNITED STATES MAGISTRATE JUDGE